Good morning, ladies and gentlemen. I'm Rita Garman. I'm the Chief Justice of the Illinois Supreme Court and it is my privilege to welcome you all here to these proceedings, Oral Argument before the Illinois Supreme Court. The court has only on a very rare occasion gone outside the venue of our Supreme Court building in Springfield, Illinois, but we decided to come here and to DuPage today. The first case of the morning is case number 119-563, People of the State of Illinois v. Mark Minnis. Are you ready to proceed? Proceed. May it please the court. Counsel. Counsel. I'm Assistant Attorney General Josh Snyder on behalf of the people of the state of Illinois. Section 3A of the Sex Offender Registration Act imposes eight disclosure requirements on sex offenders. The first five of them collect information relating to the real-world activities of sex offenders. These are they have to disclose their current address, their current place of employment, their telephone number, their employer's telephone number, and if they attend school they need to disclose the which I'll call the virtual disclosure requirements. Address sex offenders' internet activity, and these requirements are that they disclose email addresses, instant messaging identities, chat room identities, and other internet communication identities that they use or plan to use, URLs that are registered to or used by them, and then finally blogs and other internet sites that they maintain or to which they've uploaded content or posted any messages or in this case was charged with violating only the last of these disclosure requirements, the blogs and internet sites to which he has uploaded content or posted messages and information, and specifically he was charged with failing to disclose a Facebook page to which he'd uploaded a photograph of himself. The circuit court found that this last disclosure requirements, as well as the two virtual disclosure requirements under which defendant was not charged, was unconstitutionally overbroad under the First Amendment. This court should reverse the circuit court's judgment, not only because the circuit court lacked jurisdiction to address the two disclosure requirements under which defendant was not charged, but also because none of the three virtual disclosure requirements separately or together are unconstitutionally overbroad. The question of overbreadth is a question of fit. It's a question of fit between the governmental purpose that the statute serves and the scope of the statute's application. So it's not, a statute's not overbroad simply because it burdens speech. It's overbroad because it burdens substantially more speech than necessary to affect its legitimate purpose. Here, the Section 3a disclosure requirements don't prohibit any speech. Sex offenders are free to say they do, however, need to disclose the identities under which they have spoken and the online forums in which they have spoken. They don't need to disclose the content of that speech or the audience of the speech. So these content-neutral disclosure requirements are reviewed under intermediate scrutiny, which again requires substantial overbreadth. So the question of whether these disclosure requirements are substantially overbroad as, in relation to the purpose that they serve, requires that we first identify what that purpose is and second, make sure that we've identified the scope of the application. As this court and other courts have recognized, the purpose of the Sex Offender Registration Act and the disclosure requirements in that act are to protect the public from recidivist sex offenders and specifically to protect the public from recidivist sex offenders by collecting the information necessary to locate and identify those locations. And identity and location information protects the public from recidivism in two ways. First, when law enforcement collects this information under the disclosure requirements, it allows law enforcement to investigate recidivist sex crimes. Law enforcement cannot effectively investigate recidivist sex crimes if it can't locate and identify the nearby potential recidivists, that is, the sex offenders in the area. The other way that sex offenders' location and identity information protects the public from recidivism is through the function of the Sex Offender Community Notification Law, which takes the information collected by Section 3A's disclosure requirements and makes it available to the public. By making this information available to the public, it serves to alert the public to the risk of recidivism posed by sex offenders in their community. Again, the public can't be on guard against the risk of recidivism if it is not aware that there are sex offenders and potential recidivists in the community. It's important to note that juvenile sex offenders, such as defendant in this case, where a juvenile sex offender is a sex offender whose registration obligations arise from a juvenile delinquency adjudication rather than an adult conviction, their registry information is not widely made available through the Notification Law. Rather, it's distributed much more narrowly to the principal or chief administrative officer of their school, the guidance counselors of their school, and to any specific individuals that law enforcement determines their safety would be at risk were they not given this information. So now that we've got the legislative purpose of these... Can I ask a question about that? Yes. So the defendant in this case was convicted as a juvenile of a Class A misdemeanor that was related to sex and therefore he had this obligation to register and the violation of that statute is a felony. My question is this. You've argued that the purpose of the statute is to protect the public and to alert the public that there is someone who's been convicted of a sex crime, a sex offender, in their community. That's how you describe the purpose. My question is, if in fact he had complied and when he registered, he indicated that in the past reporting period, which I think was about a year, he uploaded a picture to Facebook, how practically does that information allow the public to protect themselves? In other words, what are they going to do with that information? How do you relate the posting of a picture? Disclosure requirements serve two purposes. They protect the public through dissemination under the Notification Law. They also protect the public by allowing law enforcement to investigate recidivism, which is separate from dissemination of the registry information. So defendant's particular uploading of a picture wouldn't protect the public by alerting the public to his online interactions with the public, but it would protect the public by allowing law enforcement to investigate any recidivist sex crimes he might commit involving online. So specifically the question of how uploading of a photograph to Facebook could pose a threat to the public or why that sort of activity is relevant to the purpose of the statute. There's a significant difference between the kinds of actions that a sex offender can take online and in the real world. Before the rise of the Internet, the only information that was allowed to investigate recidivist sex crimes and to alert the public to the risk of sex offenders in the community was the sex offender's real-world identity, which is provided by their current photograph, which they provide upon registration, and by their name, which they're barred from law from changing, and their home and work addresses, because people live the vast majority of their life within a reasonable commute of those two points. So with those two real-world locations, you can infer the perimeter of the community within which the sex offender is operating. Online, sex offenders' reach and ability to communicate anonymously are vastly increased. So a sex offender has an ability to interact with the public inside the public's homes. If you have a 12-year-old girl who's sitting at home in her bedroom in her pajamas surfing the Internet on her phone or on her laptop, she doesn't feel vulnerable or exposed when a message pops up on the screen in the same way that she would if she were sitting alone in a public park or on a bus and an adult stranger approached her and started talking to her. And this feeling of security allows people to often, you know, in laudable ways, interact less cautiously with others online. But it also means that they are less on guard against risk. And the risks are magnified online in some respects. In addition... So if, in fact, he had reported that he had posted a picture on Facebook, then again, what is the result of that? Would it mean that that child that you were just describing, her parents would not allow her to be on Facebook because one sex offender posted a picture on Facebook one time? No. Well, again, specifically for juvenile sex offenders, the parents or children wouldn't have access to the information, just law enforcement. So, specifically, disclosing that one has a Facebook page that one has uploaded content to, what that does is it advises law enforcement that here is an area online where the sex offender is interacting with the public. So should the sex offender, should a child have sex with that website, then law enforcement has a way to investigate it. If someone likes something on Facebook, is that, needs to be reported? Well, so let's say that I'm a sex offender and I have a Facebook page, I'm interacting on Facebook, right? When I went in for my registration, I would say that I would identify Facebook.com. And that would cover all of my interactions on Facebook, when I'm posting content, when I'm posting messages. I've apprised law enforcement, and if I'm an adult, the community in which I live and interact, that that is a place where sex offenders are interacting with the public. If I am a parent with a young child who's starting to have independent experiences online, I may go and look at my local sex offenders registry information, go into the county sheriff's department, look at the local information, and determine, you know what, here's the 10 sex offenders in the community, and I see that they're actively interacting with the public on ESPN.com, Facebook.com, a baseball chat room, and an antique toy chat room. I may decide, I am all right, I feel comfortable that the risk is adequately low on ESPN, and CNN, and Facebook, that my child's interacting in those fora are not likely to put them at great risk. But I may decide, you know what, these smaller chat rooms where the interactions are less comments and more conversations, where it's a smaller community, maybe I'm not comfortable with my children interacting there. I might use the various software applications that are available to block certain websites and protect my risk mitigation. Mr. Schneider? Yes. However, juveniles aren't online that you can look up, are they? No, they're not. They're not registered online, so a parent could go online and the juveniles are not registered. That's correct, and that's frankly the reason why juvenile sex offenders' speech is not chilled by these disclosure requirements. The chilling effect that a defendant and a MIECHE have identified is the public dissemination of this information, and the reasoning seems to be that the public generally disapproves of sex offenders and is hostile towards sex offenders. And so any public document that allows a member of the public to recognize a sex offender in a particular forum will chill the sex offender's receiving expressions of that disapproval and hostility. But this reasoning would prohibit any public record that allows the public to recognize a sex offender, including posting their names, their current photographs, and their telephone numbers. All of those things would allow the public to identify a sex offender either in person or on the telephone through caller ID and so on. Essentially, this is saying that there is no legitimate government interest in identifying sex offenders to the public, but courts have repeatedly found that not to be the case. The U.S. Supreme Court in Smith v. Doe specifically said, with respect to the Alaskan Sex Offender Registration Act, that identifying sex offenders to the public, to alert the public to the risk of recidivism posed by those sex offenders in their community, advances public safety. Here, it's not clear what exactly the chilling effect, the real chilling effect would be. Because again, for it to be overbroad, a statute needs to be not only substantially overbroad, but the overbreath also has to be real. Here, we have a fairly speculative concern that a sex offender would not go on ESPN.com or Facebook because when he comments on something, when he then registers at the end of potentially an annual period, someone will access his registry information, determine that he was on ESPN, go through the various articles, find his month's stale comment, and post a snippy comment in response. That is not the sort of chilling effect that courts have typically found protected. Moreover, the anonymity that is protected by the First Amendment is not a broad right to be anonymous at all times in your speech. The First Amendment's a right to speak. It's not a right to speak that lacks anonymity. It's an anonymity that acts as a speech catalyst. It's where speech is dependent on that anonymity. The Supreme Court and Buckley v. American Constitutional Law Foundation explained how this works in comparing the requirement that petition circulators wear name tags while circulating their petitions and that petition circulators file an affidavit containing their name and address, which was a public record but that they were not giving to the audience at the point of contact they're giving to the state. And the court explained that the affidavit was constitutional, but the name tag was not. And the reason the name tag was not is it was requiring that the speaker identify himself to his audience at the point of contact when motions were most heeded. The affidavit, although it would allow an audience, if they consulted that record, to subsequently, if they encountered that petition circulator, to identify the circulator, it was removed in time. It's the difference between compelling a speaker to identify themselves to the audience and compelling the speaker to leave a footprint in the world by which one could identify them. And sex offenders may not be permitted to brand all of their online speech with their sex offender status. They don't need to with, I'm so-and-so, I'm a sex offender, and here's what I think about the white socks. But they don't have a right to compel the state to conceal their sex offender status from the public. This is a public record that, if consulted, would allow them to be identified by someone who had consulted it. It is not a scarlet letter fixed on all of their internet communications. It's also worth noting that these are retroactive disclosures for the locations, the forums in which they have spoken. They only need to disclose those informations retroactively, which means that the odds of them facing real-time discrimination or harassment or that sort of thing is reduced. Mr. Schneider, excuse me, it's only once a year? It's, well, there are certain triggering events that will require a sex offender changes their address or workplace. They need to re-register within three days to apprise the state of those changes. Law enforcement can also request additional registrations no more than four times a year, so it's a maximum of four times a year, but it can be up to annually. And so someone would have to list every bank transaction, purchase of airline, any kind of commerce on the internet. You would have to report all of those contacts that you had over that reporting period, is that correct? No, that's not correct. The requirement is that you disclose the blogs and websites to which you've uploaded content, which it means to transfer files from your computer or your network to another computer or network. So we're talking about the transfer of pictures, audio files, video files, documents, or messages or information that you've posted. And posted, as we turn to a number of dictionaries to demonstrate, posted has a public quality. It's like posting on a website. So to post a message or information is to make that message information public in whatever forum it is, chat room, comment section, that sort of thing. If you are logging into your banking website or your credit card website, you are not posting information because you're not in a public forum of any kind. Similarly, if you purchase airline tickets, you're not posting information, you're engaging in a commercial transaction that isn't public in that way. So you wouldn't have to disclose that information. Mr. Schneider, how do you respond to the defendant's argument that there should be some sort of individualized assessment of each particular offender to determine whether the risk justifies the reporting period? Well, with respect to juvenile offenders, there is that kind of individualized risk assessment. Juvenile offenders, if their registration obligations arise from misdemeanor, two years after that adjudication, they can petition the circuit court for termination of their registration obligations. And whether the obligations are terminated depends on a report from a sex offender evaluator regarding their likelihood of risk, consideration of their emotional, family, social histories, various risk factors. And if the court finds, by preponderance of the evidence, that the juvenile sex offender is no longer a juvenile, then they'll terminate the reporting period. So there is that kind of individualized weighing for juvenile sex offenders, which is appropriate because, as courts have recognized, juveniles are not adults. There's still maturation process to go through, and they're not incorrigibly necessarily pathological or have a lapse in judgment that they can't still grow out of. For adult sex offenders, that's really a policy determination that the General Assembly has determined that for adult sex offenders, they don't have that sort of growth potential that juveniles have. And the General Assembly determined that there's an adequate risk of recidivism by sex offenders as a class to warrant this sort of protection. Defendants point out in his brief some studies that suggest that it's as low as one in four chance of recidivism, whether that's low to warrant protective measures by the legislature. I can't second-guess that decision, but there's also a number of studies that suggest that it's significantly higher. We know that the vast majority of sex offenses are not reported. They're difficult to investigate. They're difficult to discover. And that's one of the reasons that this sort of disclosure information is so important for public safety, is it provides law enforcement with a way to start investigations of online sex offenses, which otherwise can be readily hidden through the use of pseudonyms. This just requires, tell us your pseudonyms, tell us the aliases that you're interacting with the public under, and tell us the places where you're using those aliases. So if an offense is discovered in one of those areas, for example, if a piece of child pornography is discovered online and the police are investigating the exploitation of this child, they go to the child, they speak to her, they find out that she had sent a nude photo of herself to someone she believed to be a 13-year-old boy in Ohio in a chat room. He'd solicited this information from her. Your time has expired. May I conclude? Just conclude, please. All right, well, then if there are no further questions, we ask that the court reverse the lower court. Thank you. May I please the court? Counsel? My name is Darren Kimmel, and on behalf of the Office of the State Appellate Defender, I represent Mark Minnis. The First Amendment allows for anonymous speech to protect unpopular individuals from retaliation and their ideas from suppression at the hands of an intolerant society. Those words from the Supreme Court could easily have been written about this case. This court should now affirm the trial court and hold that the Internet speech disclosure requirements of the Sex Offender Registration Act are substantially overbroad and therefore unconstitutional under the First Amendment for three reasons. First, the statute eliminates the protected right to anonymous speech on the Internet. Second, the statute chills the speech of two, the statute chills too much speech by implicating all speech a registrant makes on the Internet. And third, the statute chills the speech of far too many people by failing to, by far too many people who present little or no threat to society, by failing to have an individualized risk assessment of who needs to be included in the system. Now, Mr. Kimmel, what specific language in the statute chills your second point when you said chills all speech? What language can you point to that regulates speech as opposed to disclosure only? Well, so it's, it's disclosure of everywhere you've spoken on the Internet and any names you've used. Did you say every word? Anywhere, any forum, so any website, chat room, and any name you've used. So it provides a roadmap for the police but also for the public on release of the information to find that speech. So you're correct, you don't have to disclose things you've said, but you do have to disclose the, all the other details of what, of how you've spoken. And that's for any speech you've made since the last time you registered. So I think, I think Mark Minnis' case is a, is a great demonstration of how this can, how this can go wrong, this system, and the chilling effect that it places on sex on the Internet. Mark had registered his Facebook account. Mark is a juvenile offender. He had registered his Facebook account at least twice previously, and then this time, for whatever reason, it did not appear on the registration form. The police went online and looked at his Facebook account and saw that prior to that registration, he had used that account in some ways, including uploading a new profile picture. And for that, he's now charged with a Class 3 felony. The chilling effect I'm talking about here is, in addition to the chilling effect the state argues against, there's two here. One is the, the lack of anonymous speech. The other chilling effect that we explore in the brief, and the, and the state ignores entirely in its briefs and in argument today, is this. Each time a sex offender goes to speak on the Internet, each, just before that moment of speech, you have to think, is this instance of speech worth a potential Class 3 felony down the road? There's a risk that you might forget to include that when you register. You might forget that you went on that one website that one time and posted a comment, and that would be a Class 3 felony. There's a risk each time, and so you have to weigh that risk, that you're going to keep track, you're going to keep records of every speech you've made on the Internet. Is this disclosure to the general public by a juvenile? This is a facial challenge round, so we're talking about adults and juveniles, although Mark is a juvenile, and so his speech is not necessarily disclosed to the public. There is a mechanism by which it can be disclosed to the public, and that's if law enforcement in their discretion believes that people's safety might be at risk. So that chilling effect I was just talking about, as opposed to the loss of anonymous speech, the chilling effect from that, there's also a standalone chilling effect on this possible felony conviction hanging over your head every time you speak, and you have to analyze that risk. Is this moment of speech worth a potential felony in my future? And a rational person would often probably decide, no, I'm going to speak a lot less on the Internet, so I have less to keep track of, and that's a standalone chilling effect, and that does apply to Mark, even if his information is not necessarily being broadcast to the public. Dovetailing off of Chief Justice Garment's question, but isn't the impact of statute on anonymous speech quite minimal or non-existent in this particular case? Your defendant, as a juvenile offender, does not have his registry information subject to the general public. You've indicated that. I'm not sure how that impacts his ability to speak online, and also if a defendant uploads to a national site and a viewer would have to go to a local law enforcement office just to review the information of an adult, that would seem to have a fairly unlikely impact on free speech, even in that context. It is simply after the fact, and goes to the local law enforcement's ability to keep tabs on a sex offender and investigate crimes after they are committed. So there's a few things I want to unpack in that question. So one thread of the question was, how does anonymity apply to Mark? And the answer is that argument does not apply to juvenile offenders. But this is a facial challenge, and so we're talking about adult offenders and juvenile offenders. Based on federal statistics, juvenile offenders make up about 25% of sex offender registry. So juveniles are about a quarter. So the facial challenge includes Mark, all other juveniles, and then the 75% that are adult offenders to whom the anonymous speech piece does apply. The rest of the question went to this idea of, I believe, how much does this retroactive disclosure really affect people's anonymous speech rights? The state is now making that argument. But in their opening brief, they make the exact opposite argument in describing their motivation behind the statute, which is to allow the public to find and identify all speech by sex offenders on the Internet. Now they attempt to argue that, well, they won't really find the people. It's not really going to affect their right to speak. But we're talking about a continuum of state surveillance for at least 10 years, and possibly a lifetime of a sex offender, all of your speech. The Buckley case, the state cites to and discusses, is talking about a discrete moment of speech in an election. And so there the analysis is, if your identity is revealed at the moment of your speaking of that discrete moment of speech in an election, you might be less likely to speak. And if your information is revealed after that discrete moment of speech, it's probably not going to affect that moment of speech, whether you choose to speak or not. This is not a discrete moment of speech. We're talking about all of your speech on the Internet for at least 10 years, and possibly your entire life. The Buckley case and cases like that with a discrete moment of speech are in opposite to this case. And every single court in the United States that has addressed this issue has agreed with our analysis, and no single court has adopted the state's position on this case. The state of Illinois would become not just an extreme outlier on this issue, if it adopted the state's argument, it would stand alone. And that's especially noteworthy because the statute, the Illinois Sex Offender Registry Act, is the broadest in the land that I have seen in all these cases in terms of allowing the release of sex offender information. The only cases in which courts have upheld sex offender statutes on this anonymous speech argument are where the police are hamstrung. There are high walls built in the statute around their ability to release the information. That's the 10th Circuit case, the Sheffield case. That's also the Pennsylvania Supreme Court case, Coppolino v. Noonan. In that case, the Pennsylvania case, contains an excellent summary of the case law on this issue. All the courts agree. The question is, do the police have blanket authority to release this information to the public once they take it, or is it going to stay with the police? And courts have decided the question of whether they have the constitutional right to take that information based on what happens to it afterwards. So there's unanimous agreement nationally to reject the state's position on this argument. Don't you think some of your arguments might be directed better to the legislature? I think the outcome, should this state, should this court strike down the statute, the outcome then, the legislature's job will be to figure out how to correctly, if they still want to attack this problem, how to write a statute that comports with the First Amendment. The state makes that argument in response to our too-many-people argument, that this is a matter for the legislature. It's this court's duty to review the constitutionality of the statute, and part of that duty involves passing judgment on whether the people that are involved in this scheme belong there, in terms of its overbreath. Is that your argument regarding the risk assessment you suggested? Exactly, Your number of people that present no risk to the public are included in this scheme, and their speech is burdened by the scheme. Those people are unconnected to the state's interests, and the statistics we've cited, the cases and the sources we've discussed, say that the overwhelming number, the overwhelming percentage of those people, both juveniles and adults that are included in this scheme, are little to no risk to society. That makes the burden on their speech substantially overbroad. So it is a question for the legislature, but as a policy matter, but the constitutionality of the statute also depends on an examination of the state's interest and the means that it's using to try to achieve that interest. And here that means they're scooping up a wide range of people that don't belong in the system. Mr. Kimmel, you didn't make a state constitutional argument, right, in your briefs. That was made by one of the, in the amicus brief, one of the amicus briefs, is that right? We focus on the federal constitution. Okay, and you want to employ a strict scrutiny analysis, right? We have argued that strict scrutiny is appropriate. All right, so for purposes of my question, just assume for a minute that we reject your argument that strict scrutiny applies and intermediate scrutiny applies, all right? And then we have to determine under intermediate standard whether the requirements of the statute are narrowly drawn to serve a constitution or a substantial government purpose without unnecessarily interfering with First Amendment freedoms. You'd agree with that, right? Correct. And you probably will tell me that even under the intermediate scrutiny test that it would be overbroad, is that right? That's correct, Your Honor. In doing that, in employing intermediate scrutiny, wouldn't we have to consider that the United States Supreme Court has said that the risk of recidivism is, quote-unquote, frightening and high? This court can consider that. I've talked at some length in the brief about where the Supreme Court took that from, found that quote from, and the basis for that, at root, the basis for that is from a scientific or statistical knowledge whatsoever. So it's true that Justice Kennedy, in the original plurality decision of McCoon, did make that statement, and this court can look to that, but it's not dispositive as a factual matter. Nor would the studies be dispositive, though, either. I think you bring up studies that they're 24%, I think, was the figure that I have, right, of recidivism rate? At the highest, yes. And then the state comes back and says those studies are flawed because those studies only consider convictions and not realizing that many such offenses go unreported or undetected. So they come at those numbers, right? That's their argument, Your Honor. So back to where Justice Burke was, isn't this, this court has repeatedly said that those kind of policy questions and determinations and point-counterpoint on whether which studies should apply, that's left for the legislature, isn't it? I disagree with that, and here's why. We can debate what the recidivism rate is. The state has conceded that there are individualized risk assessment methods that can tell, at least on the back end, with respect to juveniles, whether they should be taken off the registry. Those same tools can be used on the front end to determine who has high risk to commit a new sex crime. Whatever the recidivism rate is, if it's 25 percent or 50 percent, a number of people are not likely within that to commit new sex crimes, and those people's speech should not be burdened by this statute. So the legislature has the role of writing the statute, but this court needs to find that this, this scheme, it does not, is not substantially overbroad and burdening a number of people's speech who do not present a risk to recidivate. So, so in some ways, the argument over what the recidivism rate is, is, is irrelevant. As long as we agree that there are tools to determine who presents a risk of recidivating, and the state has conceded that. Now, there are jurisdictions, including Minnesota, who have set up this type of system. Is that regardless of the numbers then? I mean, if, if, if the number you were presenting was 98 percent, would that make a difference? I think that would be, that would be a problem, Your Honor. If it was that high, there might be an argument. Where's the cutoff point? 60? 70? Or frighteningly high, as the United States Supreme Court said? So that, that same McComb decision asserted that, that the number might be as high as 80 percent, I believe. There was no, the source for that, again, goes to this one individual who has no training or background in those things. Those types of numbers have been soundly rejected by the best science available, including the study that I referenced that talked about, at most, 25 percent. So we can debate those numbers to some extent. The best science seems to tell us that sex offenders' recidivism rate is actually lower than most other offenses, burglary, assault. There are high recidivism rates for a lot of crimes. Sex offenders are no different in that respect. But the broader point is, for including a number of people who have low risk of recidivism or none, which I would suggest Mark is one of those people, the burden that this statute places on their speech makes the statute substantially overbroad. Now, I want to talk about, I want to talk about the types of speech that this statute captures, because I think that's important. Before you move to that, should we be in a position then of determining which of these figures is accurate as far as recidivism, or do we assume and give deference to the legislature that may have looked at this and said this is the way to solve the problem, and they've made it as a policy decision to which we would defer? The state has the duty to support the basis for the statute, to support the basis in the statute, and so I think... So this is a fact-finding thing that should have happened at the trial court level? I think, with de novo review, I think it could, it could have happened on, before this court in the briefing, and it could have happened at the trial level. It did not happen in this case, and that's a problem because the state has the duty to justify the statute. I think this court should look to the best science available, which I, which I submit is in these broad-based longitudinal studies that we discuss and the Supreme Court of Pennsylvania discusses in the Coppolino decision I've mentioned. But even if this court does not want to engage in that policy process, if it wants to step back from that, the anonymous speech argument stands alone without that issue, and that's enough to decide this case, and also the argument that the statute gobbles up too much speech, that argument also stands alone. So even if this court decides not to go down that route, it has these two other independent arguments to rely on. But as I've said, the fact that the state essentially concedes a number of these, the people scooped up by the statute, especially juveniles, have a very low risk of recidivism, means that there needs to be some analysis on the front end of whether they deserve to be there at all. Even two years, including them juveniles in the scheme for two years, before they can possibly petition off, is a burden on their speech. That's not allowed by the First Amendment. At least we hope this court will agree with that. Now, by capturing all speech on the internet by a sex offender, the statute, I think it's important to talk someone about what that means. That includes all political speech by a sex offender. If you want an activist to change laws, they have to register all of that political speech. Any religious speech, going to church online, the statute captures that and possibly broadcasts all that information out to the public. So a sex offender going to church online now has to do so with the knowledge that the public will know he's a sex offender while going to church. It captures literary speech, business speech, and these are all types of speech that are ongoing. So your identity is suddenly open to the public and they have a roadmap to find that speech. Now, it's not, there are a number of sources we've cited, the Doe versus Pataki case, the Eby versus Vernon Rio case, that discuss the intense social stigma and public retaliation against sex offenders in their lives. You do cite Doe, which is a Ninth Circuit case, right? The Doe versus Harris case? Yes, Your Honor. Weren't the requirements of the California statute in that case much more onerous than in the present case? In Doe, the sex offender was required to register by regular mail within 24 hours of any time communication online with a new identifier was made, right? That's a lot more onerous than this statute, isn't that right? Your Honor, I see my time has expired. May I briefly respond? No such luck, Counselor. It's a very interesting question. The light's for you, not for us. I will sit down. Your Honor, it's true in Harris, and a lot of these cases are named Doe, so I try to use the other name to keep track, but the Ninth Circuit Harris case, which is quite an excellent opinion, it's true that the statute there had a quick turnaround time, and that was one of the problems, but the Harris court's analysis goes well beyond that issue to attack the anonymous speech issue and a number of other problems. And I would highlight here the state has argued that this is only once a year you might have to register, maybe four times a year. The police can show up on your doorstep at any time and ask you to register, and they can do that up to four additional times a year past the annual registration. And any time any of your information changes, you get a new cell phone, you start a new job, you move, you have to re-register. So a lot of it is unknown, and again, the police can show up tomorrow and ask you to register, and you have to be ready with your list of every website you've spoken on and every name you've used to speak there. This court should find that that's problematic. Thank you. Thank you. Just briefly address three points. First, the federal cases that defendant cites. With respect to juvenile offenders, offenders whose registry information is not made widely available to the public, the Tenth Circuit case, Shurtleff essentially upheld those disclosure requirements on the basis that it wasn't disclosed. The anonymity argument is based not on the Section 3A disclosure requirements, but on the dissemination of the information collected by those requirements under the notification law. Defendant has no burden on his speech under that law. It's not clear how he'd have standing to challenge that law. And it's worth noting that those federal cases also, none of those are criminal cases. Those are not prosecution cases. Those are cases where sex offenders filed injunctive actions in federal court, saying we are subject to these disclosure requirements that our information is then made publicly available and thus a chilling effect and so on. That's not the case here. Defendant's information is not made widely available. If the court were to strike down the notification law, it would have no effect on the charge against defendant. The information is still related to the public purpose of protecting against recidivism because it still allows law enforcement to investigate otherwise anonymous sex crimes that intersect with online interactions. Those federal cases also fail to notice or to note and analyze the relation of publicizing sex offender information with alerting the public to the risk posed by sex offenders in the community. It doesn't come up in that case, despite the Supreme Court having said in Smith v. Roe, or Doe rather, that that is a legitimate purpose that advances public safety. The second point I want to address is the too much speech argument that all speech must be registered. But no speech must be registered. Only forums and aliases need to be registered. There isn't any speech that's unrelated to the need to investigate recidivist sex offenses. If a sex offender is in an online chat room and is about to solicit a child to send him a nude photo, if he sends that solicitation, it doesn't, just because the chat room is baseball-themed, it doesn't make it unrelated to the State's purpose. If a sex offense can be committed there or evidence leading to the discovery of a sex offense can be found somewhere, it's related to the public safety purpose. The argument is made, the too much speech argument. Can you address that? How, again, does the posting of a profile picture on Facebook protect the public? I'm going to ask again. I mean, apparently one of the briefs indicated that daily users of Facebook are about one, over a billion people a day. So how does identifying that a sex offender has posted a picture on Facebook protect the public, the individual members of the public? Well, the disclosure is that they've advised it. So for an adult offender whose information would be disseminated, it would allow the public to know that here is a sex offender interacting with the public on Facebook under this name most of the time, or many, many instances, Facebook accounts are under the person's actual name, but sometimes they're not. And so now someone knows that one of the billion people who use this site every day is a sex offender. What is the member of the public supposed to do with that information to protect themselves? Well, it doesn't mean that you don't go to Facebook necessarily, but it does mean that now you know that if you get a message on Facebook from that account, that account is a sex offender's account. So you may not respond. You may decide that if you're going to respond, you're going to limit the kind of information that you disclose. Again, going back to the chat room, a baseball chat room is not something that we associate with a hotbed of criminal sexuality, but that doesn't mean that people can't use that venue to lay the ground for subsequent sex offenses or that evidence that leads to sex offenses can't be discovered in those forums. So knowing that a sex offender is active on Facebook or on some other website allows the public to make an informed decision as to whether they want to expose themselves to the risk of interacting with that person, either that particular account, as in Facebook, or by visiting that forum. It may be that if they go to that forum, they'll limit the kinds of sense of information they'll discuss. If I'm on a baseball forum, I know that it's frequented by sex offenders in my neighborhood. Maybe I don't talk about how my kids are huge fans of the Cubs. We can't wait to go to the game this weekend, or we went to a local baseball autographing at such and such a location. Maybe I don't want to give that kind of information out in that forum, knowing that it may be available to a sex offender who's known to frequent that forum. Finally, the chilling effect of simply having to disclose information. It's true that having to disclose the list of forums in which you've spoken and the pseudonyms under which you have spoken is a burden, but the mere fact of there being a burden doesn't make it an unconstitutional burden. It needs to be a burden that is not justified by the legitimate governmental purpose that motivates it. There's no question that the protection of the public from recidivism is a legitimate public purpose. Courts have routinely found that this court found in People v. Molnar in 2006 that having an absolute liability offense, a felony offense for failure to register, was appropriate because it advanced public safety. The other thing is that that burden is relatively light. Again, if you go to ESPN a thousand times in a year, you can capture all of that activity by writing ESPN.com on your registration form. You've taken all of those interactions, and you're now free of a potential sanction for those interactions because you've disclosed them. The other thing is it's important to remember that people's telephones and laptops and iPads and all these things now have browser histories. You can go back and look at all the websites that you visited in such and such period and refresh your memory. If you happen to go to a public library where it's not your particular device or you're not logged into an account of yours that tracks your information, it's true if you go to a public library and you speak under a new pseudonym that you come up with there that you never use again, you'll have to make a note somewhere. That is a burden, but that's not an unreasonable burden to put on sex offenders who pose, as the General Assembly has determined, a substantial risk of recidivism. And for those reasons and the reasons in our briefs, we ask that the court reverse the circuit court's judgment. Mr. Schneider, before you sit down, how does a member of the public specifically know that this individual who posts on Facebook has that classification? Is it a person that's registered, they've done it legally, you go to read this post, how do you know who that person is in the context of being an offender? Well, you know how a member of the public would know that a particular Facebook profile belongs to a sex offender? They would have, well, so for example, I move into a new neighborhood, I want to know who the sex offenders in the neighborhood are, and go to the local law enforcement office and request to see the registry information of those sex offenders. That tells me who they are, and it also tells me if they're on Facebook and they're following their disclosure obligations, it'll tell me, these are the Facebook profiles of your local sex offenders. But the individual has to take the extra step to cross-check it with the registration? That's right. It's a tool that's available to the public. They need not avail themselves of it, depending on how they see the risk in their particular circumstances, but it's a tool that the government makes available, and it's a legitimate tool. Let me ask you another question about the Cubs or the Sox. I'm glad you gave some parity there between the two teams. But the individual goes in and does the registration. Everything's legal, decides to put a political rant on Facebook about the governor and all four legislative leaders that there's no budget, right? The individual, including the attorney general's office, there's no problem at that point. It's just the burden of the registration, right? I mean, isn't the political rant completely legal? Oh, he can say whatever he wants. There's no restriction at all on what he says. All that the disclosure requirements do is make it possible for someone to recognize him. But if he came into this room and ranted about there not being a budget, if someone had seen him on the online registry, saw his face, they're able to recognize him from that public document, that doesn't unconstitutionally violate his right to anonymity because he's not being required to himself identify himself to his audience. The world's a big place. We recognize people from all kinds of different contexts. We're allowed to take that knowledge into new contexts. One last question. Mr. Kimmel characterized Illinois as an outlier. How do you—that our statute is so restrictive that we're an outlier? Our statute is not particularly restrictive. The way that it would be an outlier is if you only look at the statutes that were addressed by these federal cases and, I believe, by the Pennsylvania case. Those cases struck those down, but, of course, they, as we point out, they didn't consider the same purpose of alerting the public, and they were a different vehicle. They were brought as injunctive actions rather than challenging a criminal charge. Thank you. Thank you. Thank you, counsel. Case 119563, People of the State of Illinois v. Mark Minnis, will be taken under advisement as Agenda No. 7. Mr. Schneider and Mr. Kimmel, thank you for your arguments this morning. You're excused at this time.